IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 21-10426-CLH |
| | Chapter 7 |
| JIM JUNIOR MOCK, II AND | |
| LORI DALE MOCK, | |
|     Debtors. | |
| | |
| GULFCO OF ALABAMA, LLC D/B/A | |
| TOWER LOAN OF DOTHAN, | |
|     Plaintiff, | |
| v. | Adv. Proc. No. 21-01021 |
| LORI DALE MOCK, | |
|     Defendant. | |

**MEMORANDUM OPINION**

On September 14, 2022, this adversary proceeding came before the Court for trial on the Complaint filed by Plaintiff Gulfco of Alabama, LLC, d/b/a Tower Loan of Dothan ("Tower") against Defendant Lori Dale Mock ("Mrs. Mock"). For the reasons set forth below, the Court finds that the debt owed by Mrs. Mock to Tower is not excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) or 523(a)(2)(C)(i)(I) and enters judgment in favor of Mrs. Mock.

**I.   Jurisdiction**

This Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered by United States District Court for the Middle District of Alabama on April 25, 1985. Venue is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This is a final order.

## II. Facts and Procedural History

### A. The Lawnmower Loan

On March 10, 2021, Mrs. Mock purchased a Big Dog riding lawnmower for her husband, Jim Junior Mock, II, ("Mr. Mock") from Bryant's Outdoor Equipment in Dothan, Alabama. The sale price for the lawnmower was $6,044.07. Mrs. Mock paid $250 as a down payment, and the remainder of the purchase price was financed through a loan from Tower (the "Lawnmower Loan"). The Lawnmower Loan was to be repaid over 36 months at 20.99% interest, with monthly payments set at $218.29. The first payment under the Lawnmower Loan was due on April 9, 2021. The Lawnmower Loan is not the subject of the instant adversary proceeding.[1]

### B. The Live Check

On or about April 1, 2021, before the first payment under the Lawnmower Loan was due, Mrs. Mock received an unsolicited mailing from Tower that contained a "live check" for $4,001.81. Plaintiff's Exhibit 1. The mailing included documents containing phrases such as "Let us help with spring expenses," and "P.S. This check is real and can be cashed anywhere right now!" *Id*. Additionally, the enclosed pamphlet indicated to the recipient, Mrs. Mock, that "Because of your excellent credit and your status as a Tower Loan preferred customer, we are pleased to send you the attached 'Loan at Home' loan check made out in your name. This is a real check, and it can be cashed anywhere you would normally cash a check." *Id*. Under the terms of the agreement printed on the pamphlet (the "Live Check Loan"), endorsing and depositing the live check obligated Mrs. Mock to repay the $4,001.81 over eighteen months at 36.99% interest with monthly payments totaling $293. *Id*.

---

[1] Mrs. Mock and Tower executed a reaffirmation agreement for the Lawnmower Loan.

Tower sent the live check to Mrs. Mock as part of Tower's "Loan at Home" program. Through this program, Tower issued unsolicited live checks to certain Tower customers. As part of the program, Tower's home office conducted a "soft pull" on customers' credit reports and, based on the information on the credit reports, mailed the live checks to qualified customers.

On the back of the live check above the endorsement signature line, the check contained the following language:

> BY ENDORSING THIS INSTRUMENT YOU AGREE TO REPAY THIS LOAN ACCORDING TO THE TERMS OF THE CONSUMER PROMISSORY NOTE AND DISCLOSURE STATEMENT ACCOMPANYING THIS CHECK, WHICH PROVIDES YOU WITH ADDITIONAL CONTRACT TERMS IN CONNECTION WITH THIS LOAN TRANSACTION, INCLUDING AN ARBITRATION AGREEMENT. Caution: It is important that you thoroughly read the contract before you sign it.

*Id*. On or about April 9, 2021, Mrs. Mock endorsed the check and deposited it into her Peoples South Bank account. Under the terms of the contract, the first payment on the Live Check Loan was due May 12, 2021. Mr. and Mrs. Mock used the funds from the live check to purchase food for their children and to pay housing expenses and utility bills. They also paid past due bills with the live check funds. The funds from the live check were spent within two weeks after Mrs. Mock deposited them. The funds from the live check were not used to pay for bankruptcy-related expenses. At the time Mr. and Mrs. Mock filed their joint Chapter 7 petition, there were no funds in Mrs. Mock's Peoples South Bank account.

### C. Mr. and Mrs. Mock's Financial Situation

On April 23, 2021, Mr. Mock met with an attorney to discuss the possibility of filing a bankruptcy petition. Mrs. Mock did not attend the meeting and, in fact, the initial plan was for Mr. Mock to file a bankruptcy petition in his name only. Mr. and Mrs. Mock did not discuss the

possibility of filing a joint petition until after Mr. Mock met with the attorney. Further, prior to May 1, 2021, Mrs. Mock never contemplated filing a bankruptcy petition.

In the months preceding the Lawnmower Loan, the Live Check Loan, and the filing of the joint Chapter 7 petition, Mr. and Mrs. Mock suffered a series of financial hardships. Both Mr. and Mrs. Mock lost their employment with the Town of Gordon in December of 2020. Mr. Mock had been the Chief of Police while Mrs. Mock served as the City Clerk and Court Clerk. Mr. Mock subsequently gained employment through a series of jobs, but the income at each of these jobs was less than his previous income as Chief of Police in Gordon, and Mr. and Mrs. Mock had to relocate each time Mr. Mock changed jobs. Mrs. Mock was unable to secure employment, but she intended to start a grass cutting business. At the time Mrs. Mock endorsed and deposited the live check into her bank account, she was unemployed.

Despite her unemployment, at the time she endorsed and deposited the live check, Mrs. Mock intended to repay the Live Check Loan to Tower once she gained employment. Both Mr. and Mrs. Mock intended to repay the Live Check Loan to Tower and believed they could do so.

### D. The Bankruptcy Filing & Adversary Proceeding

Mr. and Mrs. Mock filed their voluntary joint Chapter 7 petition on May 3, 2021. They listed Tower on their amended Schedule D as a secured creditor of Mrs. Mock for $4,000 as secured by "LAWN MOWER AND CASH." Defendant's Exhibit 4-D. Tower filed the instant adversary proceeding against Mrs. Mock on August 13, 2021. In its Complaint, Tower alleges that the debt associated with the Live Check Loan should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A) because Mrs. Mock obtained credit from Tower under false pretenses, a false representation, or actual fraud. Additionally, Tower alleges that the debt associated with the Live Check Loan is presumptively non-dischargeable under 11 U.S.C. § 523(a)(2)(C)(i)(I) as a

debt used to acquire luxury goods or services aggregating more than $725 within 90 days before the filing of the bankruptcy petition.[2]

Mrs. Mock timely filed her Answer, and the Court held a trial on September 14, 2022, in Dothan, Alabama. At trial, Tower appeared through counsel Ben Mayer and offered the testimony of Bryce Manis, the manager of the Tower branch in Dothan, Alabama. Mrs. Mock appeared personally and through counsel Letta Gorman. The Court heard arguments from Mr. Mayer and Mrs. Gorman, testimony from Mr. Manis, Mrs. Mock, and Mr. Mock, and admitted several documents into evidence. The Court found Mr. Manis, Mrs. Mock, and Mr. Mock to be credible and forthright. At the conclusion of the trial, the Court invited – but did not require – the parties to submit post-trial briefs, and neither party submitted a brief.

### III. Legal Analysis and Conclusions of Law

**A. The Live Check Loan is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A).**

Tower alleges that the $4,001.81 debt Mrs. Mock incurred when she deposited the live check is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) of the Bankruptcy Code provides, in relevant part, that[3]:

> (a) A discharge under section 727 [ . . . ] of this title does not discharge an individual debtor from any debt–
> (2) for money, property, services, or an extension, renewal, or refinancing of creditor, to the extent obtained by–
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). A creditor seeking to except a debt from discharge pursuant to § 523(a)(2)(A) must satisfy its burden by a preponderance of the evidence. *Sec. & Exch. Comm'n v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 892 (11th Cir. 1996); *see also Grogan v. Garner*, 498

---
[2] The current aggregate limit under 11 U.S.C. § 523(a)(2)(C)(i)(I) was increased on April 1, 2022, under 11 U.S.C. § 104 to $800. At the time of Debtors' petition, the limit was $725.
[3] All references to the Bankruptcy Code are to Title 11 of the United States Code.

U.S. 279, 291 (1991) (holding § 523 actions are determined by a preponderance of the evidence standard). Coupled with the burden of proof is the "'basic principle that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start.'" *Harris v. Jayo (In re Harris)*, 3 F.4th 1339, 1345 (11th Cir. 2021) (quoting *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997)).

Tower's Complaint does not specify whether Mrs. Mock incurred the debt from the live check through false pretenses, a false representation, or actual fraud. Accordingly, the Court will examine each type. *See In re Zeller*, 242 B.R. 84, 87 (Bankr. S.D. Fla. 1999) ("Because 'false pretenses,' 'false representation,' and 'actual fraud' are placed in the disjunctive, Congress intended that any one of these is sufficient to establish nondischargeability under § 523(a)(2)(A)."); *see also Matter of Johnson*, 2017 WL 1839159 at *8 (Bankr. N.D. Ala. May 5, 2017); *Acceptance Loan Co. v. Christopher (In re Christopher)*, 578 B.R. 842, 847 (Bankr. S.D. Ala. 2017).

### 1. False Pretenses

"The concept of 'false pretenses' is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner." *FCC Nat'l Bank v. Gilmore (In re Gilmore)*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998). Further, "[f]alse pretenses 'may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol or token calculated and intended to deceive.'" *Id*. (quoting Black's Law Dictionary 602 (6th ed. 1990)). "It is 'a series of events, activities[,] or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor.'" *Gilmore*, 221

B.R. at 872 (quoting *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996)). Additionally, "[s]ilence or concealment as to a material fact can constitute false pretenses." *Gilmore*, 221 B.R. at 872 (citing *Bank of Miami v. Quintana (In re Quintana)*, 4 B.R. 508, 510 (Bankr. S.D. Fla. 1980)).

Mrs. Mock did not request the live check from Tower; rather, Tower sent the check, along with related marketing materials, unsolicited. Based on Mr. Manis' testimony, Tower selected the recipients for the "Loan at Home" program based on the results of a "soft pull" credit report on its customers. Mrs. Mock was an existing, albeit extremely new, customer of Tower, having obtained the Lawnmower Loan in March of 2021. Following the "soft pull" on Mrs. Mock's credit report, and before the first payment on the Lawnmower Loan came due, Tower determined that she qualified for a new loan of $4,001.81.

While Tower contends that Mrs. Mock knew that she was going to file for bankruptcy at the time she endorsed and deposited the live check, the credible testimony of Mr. and Mrs. Mock indicates otherwise. Mr. Mock testified that he had been considering filing for bankruptcy due to a decrease in his income, but he did not meet with an attorney about filing bankruptcy until April 23, 2021. Additionally, both Mr. and Mrs. Mock testified that Mr. Mock intended to file a petition in his name only, and that the possibility of a joint petition was not discussed by Mr. and Mrs. Mock until *after* Mr. Mock's meeting with an attorney on April 23, 2021. Indeed, the evidence indicates that Mrs. Mock did not consider filing bankruptcy until almost two weeks after she endorsed and deposited the live check.

By endorsing and depositing the live check, Mrs. Mock simply accepted an offer of credit from Tower for $4,001.81. This offer was both unsolicited and fixed in its amount, required monthly payment, and interest rate. No action, inaction, statement, silence, symbol, or token made

- 7 -

Case 21-01021 Doc 37 Filed 12/05/22 Entered 12/05/22 13:48:36 Desc Main
Document Page 7 of 19

by Mrs. Mock induced Tower to send her the live check. Tower came to its decision based solely on its customer list and the results of "soft pull" credit reports.

Facing financial hardship from unemployment, multiple relocations, and the COVID-19 pandemic, Mrs. Mock accepted the funds from Tower to make ends meet, and she used those funds to pay household expenses. Mrs. Mock testified that when she endorsed the live check and deposited it into her bank account, she intended to repay the loan. Mr. Mock's testimony was substantially the same. Accordingly, the Court finds that Tower has failed to prove by a preponderance of the evidence that Mrs. Mock obtained the live check funds under false pretenses.

### 2. False Representation

"A false representation typically requires an express misrepresentation by a debtor to an issuer of credit." *Christopher*, 578 B.R. at 848 (citing *Matter of Johnson*, 2017 WL 1839159 at *8 (Bankr. N.D. Ala. May 5, 2017)). "Reckless disregard for the truth can constitute a false representation." *Christopher*, 578 B.R. at 848 (citing *Compass Bank v. Meyer (In re Meyer)*, 296 B.R. 849 (Bankr. N.D. Ala. 2003)). "The term 'reckless' has been interpreted to be the equivalent of *intentional*." *In re Booth*, 174 B.R. 619, 623 (Bankr. N.D. Ala. 1994) (italics in original).

Tower contends that Mrs. Mock misrepresented her financial situation and her ability to repay the loan by endorsing and depositing the live check while she was unemployed. The evidence does not support Tower's contention. While Mrs. Mock was indeed unemployed when she endorsed and deposited the live check, she testified that she was looking for work and intended to start a grass cutting business. Her search for employment was hampered by the COVID-19 pandemic. Despite their financial difficulties, both Mr. and Mrs. Mock testified that they intended to repay Tower. At that time, Mr. Mock was employed, but his income was lower than what he earned as Chief of Police. As a result, Mr. and Mrs. Mock struggled to feed their family and keep

their household finances afloat, which does not equate to reckless disregard. *See Christopher*, 578 B.R. at 849 (noting "[t]he mere struggle to meet one's monthly bills does not rise to the level of reckless disregard, nor does one's unrealistic optimism in the face of a difficult financial situation.").

Mrs. Mock's testimony indicates that despite her unemployment and her family's financial difficulties, she believed she could repay Tower by finding new employment, obtaining help from her husband and his income, or a combination of the two. While Mrs. Mock's situation might suggest that her belief was implausible or improbable, her credible testimony does not show that this belief resulted from a reckless disregard for the truth. Accordingly, the Court finds that Mrs. Mock did not obtain the live check funds through false representation.

### 3. Actual Fraud

For a creditor to prove actual fraud, the complaining creditor must prove, by a preponderance of the evidence, that:

> (1) the debtor made representations;
> (2) at the time, the debtor knew the representations were false;
> (3) the debtor made the false representations with the purpose and intention of deceiving the creditor;
> (4) the creditor justifiably relied on such representations; and
> (5) the creditor sustained a loss as a result of the representations.

*Meyer*, 296 B.R. 849, 858 (Bankr. N.D. Ala. 2003) (citing *AT&T Universal Card Servs. Corp. v. Reach (In re Reach)*, 225 B.R. 236, 239 (Bankr. N.D. Ala. 1997)); *see also Christopher*, 578 B.R. at 849. "Actual fraud is determined on a case-by-case basis." *Christopher*, 578 B.R. at 849 (citation omitted). The Court will examine each factor in turn.

#### i. Mrs. Mock's representations to Tower were – at most – implied.

The live check at issue was nothing more than an unsolicited offer for Mrs. Mock to enter into an unsecured installment loan with Tower. The amount of the loan, the interest rate, required

- 9 -

Case 21-01021　Doc 37　Filed 12/05/22　Entered 12/05/22 13:48:36　Desc Main
Document　　Page 9 of 19

minimum monthly payment, and the length of the repayment term were predetermined by Tower. By endorsing the live check, "a debtor represents only that he intends to abide by the agreement presented with the check, and 'has made a false representation only if, at the time the debt is incurred, he intends to breach the agreement.'" *Christopher*, 578 B.R. at 849 (quoting *Meyer*, 296 B.R. at 858).

Tower asserts that when Mrs. Mock endorsed and deposited the live check, she represented to Tower that she had the ability to repay the loan under the terms of the contract and that she had the intent to repay the loan, when, according to Tower, she possessed neither. When faced with similar issues involving credit card debt

> [m]any courts have held that when credit is extended without the debtor and creditor having any face-to-face interaction, as happened here; the debtor, by accepting the extensions of credit, in this case by signing and depositing the preapproved check and in other cases by using a credit card, represents that he has the intent and the ability to repay the debt so incurred.

*Christopher*, 578 B.R. at 849 (citing *Meyer*, 296 B.R. at 859) (collecting cases)). While the Court is skeptical of these implied representations, it will assume *arguendo* that Mrs. Mock did make such representations and will examine each independently to determine whether Mrs. Mock made such representations falsely.

### ii. Mrs. Mock did not make false representations to Tower.

#### a. Mrs. Mock did not misrepresent her ability to repay the Live Check Loan.

Tower contends that by endorsing and depositing the live check, Mrs. Mock knowingly misrepresented to Tower that she had the ability to repay the Live Check Loan. The live check sent to Mrs. Mock did not contain an affirmation regarding the endorsee's ability to repay the

loan.[4] The only language on the back of the live check was an acknowledgement by the endorsee to agree to the terms and conditions of the attached loan contract. As such, the very language of the live check did not require Mrs. Mock to explicitly affirm her ability to repay the loan.

Regardless, Mrs. Mock testified that despite her financial situation, she believed she could repay the loan when she endorsed and deposited the live check. She believed that she would find employment, that her husband would begin bringing home enough money to pay the bills, or a combination of the two. Accordingly, the Court does not find that Mrs. Mock falsely represented her ability to repay when she endorsed and deposited the live check.

### b. Mrs. Mock did not misrepresent her intent to repay the Live Check Loan.

Tower asserts Mrs. Mock misrepresented her intention to repay the Live Check Loan as evidenced by Mr. and Mrs. Mock filing their joint Chapter 7 petition shortly after depositing the live check. A determination of fraudulent intent is an issue of fact and depends largely upon an assessment of the credibility and demeanor of the debtor, and a review of the totality of the circumstances is relevant in determining a debtor's intent. *See Equitable Bank v. Miller*, 39 F.3d 301, 305 (11th Cir. 1994). "Fraudulent intent may be inferred from the circumstances, 'but if there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor.'" *In re Gilbert*, 631 B.R. 921, 927 (Bankr. N.D. Fla. 2021) (citing *In re Smith*, 2021 WL 1234245, at *6 (Bankr. N.D. Ga. March 31, 2021) (quoting *Advance Fin. Corp. v. Gross (In re Gross)*, 2011 WL 3881015, at *6 (Bankr. N.D. Ga. June 10, 2011)) (internal quotation marks omitted)).

---

[4] In *Acceptance Loan Co. v. Christopher (In re Christopher)*, 578 B.R. 842, 850 (Bankr. S.D. Ala. 2017), the court analyzed the debtor's representations regarding ability to repay a live check debt when the check contained the following statement: "THE UNDERSIGNED CERTIFIES THEY HAVE THE ABILITY TO REPAY THIS DEBT."

Both Mr. and Mrs. Mock testified that they intended to repay the Live Check Loan to Tower when Mrs. Mock endorsed and deposited the live check. Mrs. Mock testified that she believed she could repay the loan once she gained employment, and Mr. Mock testified that he viewed the debt as a household debt that had to be repaid. While Mr. and Mrs. Mock were admittedly suffering substantial financial hardships, the Court finds their testimony regarding their intent to repay the Live Check Loan to Tower to be sincere. Furthermore, Mrs. Mock testified she was not considering filing for bankruptcy at the time she deposited the live check. Accordingly, the Court does not find that Mrs. Mock falsely represented her intent to repay when she endorsed and deposited the live check.

Because the Court finds that Tower has not proven, by a preponderance of the evidence, that Mrs. Mock made representations to Tower regarding her intent and ability to repay the loan that she knew to be false, Tower has not proven the second element of actual fraud.

### iii. Mrs. Mock did not intend to deceive Tower.

A debtor's intent to deceive a creditor is determined on a case-by-case basis. *Christopher*, 578 B.R. at 850. Several courts, including the *Christopher* Court, have utilized a twelve-factor test to examine whether the debtor incurred a debt with the intent to deceive that creditor. The twelve factors are:

> (1) the length of time between the charges made and the filing of bankruptcy;
> (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
> (3) the number of charges made;
> (4) the amount of the charges;
> (5) the financial condition of the debtor at the time the charges are made;
> (6) whether the charges were above the credit limit of the account;
> (7) did the debtor make multiple charges on the same day;
> (8) whether or not the debtor was employed;
> (9) the debtor's prospects for employment;
> (10) the financial sophistication of the debtor;
> (11) whether there was a sudden change in the debtor's buying habits; and

- 12 -

(12) whether the purchases were made for luxuries or necessities.

*Christopher*, 578 B.R. at 850-51 (citing *Meyer*, 296 B.R. at 860 n. 14).

For the first factor, Mrs. Mock endorsed the live check on April 9, 2021, and deposited it shortly thereafter. She and her husband filed their joint Chapter 7 petition on May 3, 2021, less than a month after she endorsed and deposited the live check. While this is a short interval, Mrs. Mock did not endorse and deposit the live check immediately before filing for bankruptcy. Accordingly, factor one weighs slightly in Mrs. Mock's favor.

For the second factor, the evidence clearly indicates that Mrs. Mock did not consult a bankruptcy attorney until at least two weeks after she endorsed and deposited the live check. Her first discussion about bankruptcy was with Mr. Mock after he met with an attorney on April 23, 2021. Factor two clearly weighs in favor of Mrs. Mock.

Given the nature of the live check as an unsolicited singular offer to enter into an installment loan contract, it was impossible for Mrs. Mock to incur further charges from the live check offer. As such, factor three weighs neither for nor against Mrs. Mock.

As for the fourth factor, the total amount of the debt incurred through the live check loan, while substantial, is less than the $5,794.07 extended by Tower to Mrs. Mock to purchase the lawnmower less than one month before the Live Check Loan. Under the circumstances, factor four weighs neither for nor against Mrs. Mock.

For the fifth factor, Mrs. Mock faced a difficult financial situation at the time she endorsed and deposited the live check. At the time, she was unemployed, and she and her husband struggled to feed their children and pay basic housing expenses. While Mrs. Mock was unemployed at the time, she was hopeful that she could find employment and intended to start cutting grass for money once the weather turned warmer. She testified that she intended to repay the loan and believed

- 13 -

that she could repay the loan once she found employment. Accordingly, despite her financial situation, the fifth factor does not weigh against Mrs. Mock.

Like the third factor, the sixth factor does not apply because the amount offered through the Live Check Loan was predetermined by Tower; there was no credit limit for Mrs. Mock to exceed. Accordingly, factor six weighs neither for nor against Mrs. Mock.

As for the seventh factor, the evidence does not indicate that Mrs. Mock incurred any other charges with Tower on April 9, 2021, aside from the Live Check Loan. Factor seven weighs in favor of Mrs. Mock.

The eighth factor weighs against Mrs. Mock. At the time she endorsed and deposited the live check, Mrs. Mock was unemployed, and had been unemployed for some time.

The ninth factor does not weigh against Mrs. Mock. Mrs. Mock testified that she was looking for employment but that she encountered difficulty finding employment due, in part, to the effects of the COVID-19 pandemic. Still, she testified that she believed she would find employment. Additionally, Mrs. Mock testified that she intended to operate a grass cutting business once the weather warmed.

As for the tenth factor, neither Tower nor Mrs. Mock presented evidence or offered testimony as to Mrs. Mock's financial sophistication. Factor ten weighs neither for nor against Mrs. Mock.

The eleventh factor neither weighs for nor against Mrs. Mock because no evidence or testimony was offered as to Mrs. Mock's buying habits before and after she endorsed and deposited the live check.

The twelfth and final factor weighs heavily in favor of Mrs. Mock. Mrs. Mock testified that she used the funds from the Live Check Loan to feed her children, pay utilities, and pay

housing expenses. Mr. Mock testified that they prioritized paying delinquent bills. These expenses are necessities and are in no way luxuries.

In weighing the twelve factors, the Court finds that Mrs. Mock did not have the intent to deceive Tower when she endorsed and deposited the live check; thus, Tower has failed to carry its burden on the third element for actual fraud.

### iv. Tower did not justifiably rely on Mrs. Mock's representations.

Tower claims that it justifiably relied on Mrs. Mock's endorsement as a representation to lend Mrs. Mock the $4,001.81 through the live check. The Court has already determined in Part III.A.3.ii. that Mrs. Mock did not make a false representation to Tower. However, even assuming *arguendo* that Mrs. Mock's endorsement and deposit of the live check constitutes a representation, the evidence establishes that Tower could not have relied, justifiably or otherwise, on such representation.

Section 523(a)(2)(A) requires proof of "justifiable, but not reasonable, reliance." *Field v. Mans*, 516 U.S. 59, 74, 165 S. Ct. 437, 133 L. Ed. 2d 351 (1995). "Justifiable reliance is determined by a subjective standard 'based on the creditor's own abilities and knowledge, or the knowledge that [the creditor] should have from the facts that are available to [it].'" *Gilbert*, 631 B.R. at 927 (citations omitted); *see In re Vann*, 67 F.3d, 277, 283 (11th Cir. 1995).

While some courts have found justifiable reliance when a debtor uses a pre-approved credit card issued by the creditor, at least one court has concluded that there can be no reliance in the context of a live check. *See Beneficial of Missouri, Inc. v. Shurbier (In re Shurbier)*, 134 B.R. 922, 926 (Bankr. W.D. Mo. 1991). As the court in *Shurbier* observed, while "[r]eliance may be part and parcel to the ongoing relationship between the credit card issuer and the credit card user" in an open-ended credit arrangement, "a loan is a discrete transaction." *Id*. While acknowledging

that the debtors had taken out small loans from the creditor in the past, the court in *Shurbier* held such loans could not be "construed as a representation that that they would repay any future unsolicited loans" from the creditor. *Id.*

In the case at bar, Tower, through its internal processes, determined that Mrs. Mock should receive a "Loan at Home" live check for $4,001.81. The only bases for this determination were Mrs. Mock's status as an existing customer through the Lawnmower Loan and Tower's "soft pull" on Mrs. Mock's credit report. This unsolicited Live Check Loan was to be repaid over 18 months at 36.99% interest through monthly payments totaling $293. Plaintiff's Exhibit 1. Tower set these terms on or before April 1, 2021, when it mailed the live check to Mrs. Mock. In fact, when Tower made its decision to send the live check, Mrs. Mock was completely unaware of the check's existence. Mrs. Mock's endorsement of the live check on April 9, 2021, could not have possibly induced Tower to extend the offer on April 1, 2021. As such, at the time Tower mailed the live check to Mrs. Mock, it was impossible for Tower to have relied in any fashion, justifiably or otherwise, on any representation made by Mrs. Mock. The representation, if one ever existed, had not yet occurred and at that point in time was not certain to occur. As the court in *Shurbier* stated: "Absent proof of [creditor]'s clairvoyant abilities, this Court is hard pressed to find that [creditor] relied upon a representation which occurred subsequent in time to [creditor]'s action of issuing the check." 134 B.R. at 925. This Court agrees.

The fact that Mrs. Mock eventually did endorse and deposit the live check on April 9, 2021, does not change the fact that Tower, on April 1, 2021, did not know, and could not possibly have known, whether Mrs. Mock would endorse and deposit the live check, whether she would throw the check away, or even whether the check would get lost in the mail. Any of those events could have happened, and none would have changed the amount printed on the live check, the interest

rate, the minimum monthly payment, and the length of the repayment terms. None of those events would have impacted Tower's decision to make the Live Check Loan, a decision Tower reached on its own.

Therefore, the Court finds that Tower did not justifiably rely on Mrs. Mock's endorsement and deposit of the live check to extend the offer to Mrs. Mock. To hold otherwise would require logical and temporal contortions, and the Court is not that flexible.

### v. Tower did suffer a loss.

There is no dispute that Tower suffered a loss of $4,001.81 when Mrs. Mock endorsed and deposited the live check. Therefore, the Court finds that Tower has satisfied the fifth element.

However, because Tower can prove only the fifth element of actual fraud, Tower has not proven by a preponderance of the evidence that Mrs. Mock obtained the live check funds through actual fraud.

Tower has failed to carry its burden to prove that Mrs. Mock obtained the live check funds through false pretenses, a false representation, or actual fraud. The evidence does not suggest anything beyond the classic example of an honest but unfortunate debtor who tried to use every available option to pull herself and her family out of financial despair. As the Bankruptcy Court for the Eastern District of Virginia noted:

> There is nothing illegal or improper about [a] cardholder accepting [an] invitation to tide himself over a period of adversity . . . A debtor's expectation that his troubles may be temporary and that his situation will improve enough to permit him to pay his debts may be overly optimistic or unrealistic, *especially in the hindsight of bankruptcy*, but such behavior without . . . evidencing an intent not to pay the debt incurred should not constitute fraud under section 523(a)(2)(A).

*In re Baker*, 1998 WL 34342251, at *5 (Bankr. E.D. Va. Apr. 6, 1998) (quoting *In re Lippert*, 206 B.R. 136, 141 (Bankr. N.D. Ohio 1997) (emphasis added). Accordingly, the Court finds that the live check debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

## B. The Live Check Loan is not excepted from discharge under 11 U.S.C. § 523(a)(2)(C)(i)(I).

Tower alleges that the debt associated with the Live Check Loan is presumptively non-dischargeable under 11 U.S.C. § 523(a)(2)(C)(i)(I). Section 523(a)(2)(C)(i)(I) of the Bankruptcy Code provides, in relevant part, that:

> (C)(i) for the purposes of subparagraph (A)–
> (I) consumer debts owed to a single creditor and aggregating more than $725 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief under this title are presumed to be nondischargeable[.]

11 U.S.C. § 523(a)(2)(C)(i)(I). While the Bankruptcy Code does not define "luxury goods or services," § 523(a)(2)(C)(ii)(II) states that "the term 'luxury goods or services does not include goods or services reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor[.]" The presumption of non-dischargeability under 11 U.S.C. § 523(a)(2)(C) is rebuttable. *In re Tabar*, 220 B.R. 701, 704 (Bankr. M.D. Fla. 1998) ("Once the plaintiff has established the requirements of 11 U.S.C. § 523(a)(2)(C), the burden shifts to the defendant to rebut the presumption of fraud.").

There is no dispute that the debt was incurred within 90 days preceding the joint Chapter 7 petition; however, Tower did not offer any evidence to support the claim that Mrs. Mock spent the $4,001.81 on luxury goods or services. Rather, Mr. and Mrs. Mock testified that the live check funds were used to purchase food for their family, pay housing expenses, pay utility bills, and pay delinquent bills. Because Tower has failed to establish that Mrs. Mock spent the live check funds for anything other than necessary household expenses, much less luxury goods or services, the Court finds that Tower has not met its burden. Accordingly, the debt incurred by Mrs. Mock through the endorsement and deposit of the live check is not presumptively non-dischargeable under 11 U.S.C. § 523(a)(2)(C)(i)(I).

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Tower has failed to carry its burden to establish that Mrs. Mock obtained the live check funds through false pretenses, false misrepresentation, or actual fraud. Therefore, the live check debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The Court further finds that Tower failed to carry its burden to establish that such funds were used to purchase luxury goods or services. Therefore, the live check debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(C)(i)(I). Accordingly, the Court will enter a separate Final Judgment in favor of Defendant Lori Dale Mock declaring that the debt made the subject of the Complaint is dischargeable.

Done this 5th day of December, 2022.

Christopher L. Hawkins
United States Bankruptcy Judge

c: Kent D. McPhail, Attorney for Plaintiff
Letta Dillard Gorman, Attorney for Defendant